IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| BOBBY C. SCHULE, #1874383 | § | |
| VS. | § | CIVIL ACTION NO. 4:16cv633 |
| DIRECTOR, TDCJ-CID | § | |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Petitioner Bobby C. Schule, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For reasons set forth below, the Court finds that the petition is not well-taken and that it will be denied.

Procedural History of the Case

Schule is in custody pursuant to a Collin County conviction for aggravated assault with a deadly weapon, in Cause Number 416-80586-2012. SHCR[1] at 156. On July 26, 2013, after a jury trial, he was sentenced to twelve years of confinement in the Texas prison system. *Id.* The conviction was affirmed. *Schule v. State*, No. 05-13-01200-CR, 2015 WL 1859040 (Tex. App. - Dallas Apr. 22, 2016, no pet.).

Schule filed an application for a writ of habeas corpus in state court. SHCR at 5. Chris Knox, Schule's trial attorney, submitted an affidavit in response to allegations of ineffective assistance of counsel. *Id.* at 65-70. Co-counsel Bill Wirskye likewise submitted an affidavit. *Id.* at 86-89. Lori L. Ordiway, Schule's appellate attorney, submitted an affidavit in response to allegations of ineffective assistance of appellate counsel. *Id.* at 90-98. The state trial court issued findings of fact and conclusions of law. *Id.* at 127-135. On August 3, 2016, the Texas Court of Criminal Appeals denied the application without written order on findings of the trial court without a hearing (Dkt. #14-30).

---

[1]"SHCR" refers to the state habeas clerk's record, followed by the page number. "RR" refers to the reporter's record of the transcribed testimony during trial, preceded by the volume number and followed by the page number.

The present petition (Dkt. #1) was filed on August 22, 2016. Schule submitted a memorandum in support of the petition (Dkt. #3). He argues that he is entitled to federal habeas corpus relief for the following reasons:

1. He is actually innocent of said offense due to ineffective assistance of counsel;

2. He is actually innocent because trial counsel was ineffective for failing to call his son, Christopher Schule, as a witness;

3. The trial court abused its discretion by denying the jury's request to have Justin Brazil's testimony read back to the jury;

4. He is actually innocent because trial counsel failed to request a proper jury instruction;

5. The trial court abused its discretion by not allowing his witnesses to testify;

6. He is actually innocent because appellate counsel did not raise valid ineffective assistance of trial counsel claims on appeal; and

7. State witness Joe Cumpian committed perjury.

The Director filed an answer (Dkt. #13) on January 18, 2019. Schule filed a reply (Dkt. #15) on February 8, 2019.

<u>Factual Background of the Case</u>

The Fifth Court of Appeals provided a lengthy discussion of the facts as follows:

Justin Brazil, a passenger in a Ford Taurus driven by Joe Cumpian, sustained a gunshot wound to his head. The gunshot striking Brazil was fired by Schule while he was driving a Ford F-150 pickup truck in the same direction as Cumpian's vehicle on a roadway in Collin County, Texas. The incident of road rage resulted in Schule being charged with aggravated assault. *See* Tex. Penal Code Ann. § 22.02(a)(2) & (b).

Cumpian testified that on December 16, 2011, as he was driving home from work with his passenger, Brazil, Schule's truck pulled out of a gas station onto Highway 380 at Airport Drive directly in front of Cumpian's vehicle, and Cumpian, traveling eastbound, swerved into the passing lane of a two lane divided highway to avoid a collision. According to Cumpian, Schule's truck moved into the left lane behind Cumpian's vehicle. "Just to irritate" the driver of the pickup truck, Cumpian remained in the left lane staying even with another vehicle in the right lane so that Schule's truck could not pass Cumpian's vehicle. Schule followed closely behind Cumpian's vehicle and flashed his bright lights. Cumpian maintained his lane position preventing Schule's truck from passing for about five miles, and Schule continued to flash his lights.

Brazil was asleep in the front passenger seat. Cumpian awoke him and said, "This guy is flashing his lights. Once I get closer to Princeton, I'm going to pull over. See if he pulls over with us." Cumpian testified he wanted Schule's truck to pull over so that he could talk to the driver and "see what his issue was." As Cumpian approached Princeton, he passed the vehicle he was traveling next to and pulled into the right lane

2

of eastbound traffic. Schule's truck then pulled behind Cumpian's vehicle in the right lane of traffic and continued flashing his lights. Schule's truck remained behind Cumpian's vehicle all the way into Princeton. Cumpian signaled a right turn into a car wash "just to see if he was going to follow me in there." Schule's truck moved into the left lane and an object Cumpian believed was a drink can was thrown from Schule's truck at Cumpian's vehicle but did not hit Cumpian's vehicle. Instead of turning into the car wash, Cumpian continued traveling eastbound on Highway 380.

For a relatively short distance, Cumpian followed Schule in the right lane of eastbound traffic. According to Cumpian, as the vehicles approached a traffic light at the intersection of Second Street, Cumpian moved into the left eastbound lane and pulled up beside Schule's truck. Schule and the passenger in his truck, his son Christopher, were "yelling stuff back and forth." Another drink can was thrown from Schule's truck that hit, but did not break, the windshield of Cumpian's vehicle. Brazil rolled down his window and threw a can of soda retrieved from the backseat at Schule's truck. Brazil threw a closed three-inch pocket knife retrieved from the console cup holder out the window that hit below the driver's side window of Schule's truck. The traffic light at Second Street turned green, and Cumpian drove on. At the traffic light at the intersection of Fourth Street, Cumpian drove into the middle of the intersection and stopped. Schule's truck was approaching, and Cumpian indicated he moved his vehicle so that it straddled the right and left eastbound lanes to prevent Schule's truck from moving beside him. As Schule's truck was approaching, the traffic light turned green, and Cumpian proceeded eastbound on Highway 380. Schule's truck was three to four car lengths behind Cumpian's vehicle as Cumpian accelerated away from the traffic light. Cumpian testified that he felt something "bang" on the back of his vehicle, and he slowed to determine if an item had been thrown from Schule's truck. Brazil reached into the backseat to get another can of soda to throw at Schule's truck. According to Cumpian, his vehicle was traveling at forty to fifty miles per hour and Schule's truck sped up to seventy or eighty miles per hour to pass Cumpian's vehicle. As they were passing Princeton High School, Cumpian saw a gun being held outside the driver's window of Schule's truck. Gunshots then broke the rear window and the right rear passenger window of Cumpian's vehicle. Cumpian indicated another gunshot hit the body of his car. Cumpian testified he did not have a gun in his vehicle and did not fire a gun in this incident.

Cumpian grabbed Brazil by his shirt collar, pulled him down, and steered his vehicle into oncoming traffic to get away from Schule's truck. He then drove his vehicle to the shoulder on the right side of the road. Cumpian exited his vehicle. When Brazil did not respond to Cumpian screaming his name, Cumpian ran to the passenger side of the vehicle. Cumpian testified that he could see blood coming from the back of Brazil's head, and Brazil was nonresponsive.

Cumpian called 9-1-1 for assistance, and a recording of the telephone call was played for the jury. On that recording, Cumpian told the 9-1-1 operator that "[t]hese guys drove by my car and opened fire" and Schule's truck "pulled up next to me and started shooting into my car." Cumpian informed the operator that his friend had been shot in the head. Cumpian described Schule's truck and the four-wheeler and hunting gear in the truck bed.

Brazil testified that on the evening of December 16, 2011, he was riding home from work in a vehicle driven by Cumpian. Brazil had dozed off and he believed his seat was slightly reclined. At the intersection of Airport Boulevard and Highway 380, he awoke to some "commotion," screaming, and erratic driving. He recalled Schule's

truck moving in front Cumpian's vehicle and braking hard. According to Brazil, Cumpian and Schule were driving erratically back and forth and acting foolish.

Cumpian and Schule were still driving erratically when Cumpian awoke Brazil, who had apparently dozed off again, and said, "Brazil, we're going to pull over and beat them up." Cumpian attempted to get Schule to pull off of the road at the location of a car wash, but Schule did not leave the roadway. As Schule's truck passed Cumpian's vehicle on the left, the passenger window of Schule's truck came down, and "they started throwing beer bottles at us," with a beer bottle barely missing the roof of Cumpian's vehicle. Cumpian drove on, and Cumpian's vehicle and Schule's truck continued driving erratically until they reached a red light at the intersection of Second Street in Princeton. Cumpian's vehicle was in the left lane and Schule's truck was in the right lane. Brazil threw a soda can at Schule's truck that hit the driver's side rear passenger window. Cumpian threw a closed pocket knife that hit Schule's truck. After leaving the traffic light at the intersection of Second Street, nothing else was thrown from Cumpian's vehicle. Cumpian's vehicle proceeded to the traffic light at the intersection of Fourth Street. Schule's truck was in the left lane, and Cumpian's vehicle was in the right lane. Cumpian's vehicle traveled into the intersection, and Cumpian had to back up to get out of the intersection. Cumpian said "somebody was waving a pistol." When the light changed, Cumpian sped away from the intersection smoking his tires. He got in front of Schule's truck and moved into the left lane traveling at about forty to fifty miles per hour.

As they were passing Princeton High School, Brazil heard a noise and thought Cumpian's vehicle had run over something. Cumpian said, "Hey, hey, he's shooting." A second gunshot went through the back window of Cumpian's vehicle, and a third gunshot hit Brazil in the side of his head. When Brazil saw Schule's truck after the gunshots were fired, the truck was in the right lane approximately a car length behind Cumpian's vehicle, which was in the left lane.

Brazil testified that after he was shot, he knew Cumpian's vehicle was stopped and heard Cumpian on a phone frantically indicating Brazil had been shot in the head by a "road rager." Brazil was transported by helicopter to a hospital where he was in a coma for several days. Brazil's medical records were admitted in evidence. Brazil testified regarding the residual physical problems he experienced as a result of the gunshot wound, including severe paralysis of one of his hands.

Sergeant Mitchell Sellman of the Collin County Sheriff's office testified that on December 16, 2011, he was on call and notified of a shooting. He spoke with Sergeant Phillip Pannell and learned there had been a road rage incident that began in McKinney around Airport Road and Highway 380 and ended with an individual being shot near Princeton High School on Highway 380, and that the suspect's truck had been stopped in Farmersville. After Schule was taken into custody, Sellman conducted a custodial interview of Schule. Schule told Sellman he was under the impression he had been fired upon. In the videotape of Schule's custodial interview by Sellman and Texas Ranger P. A. Davidson, which was admitted in evidence and played at trial, Schule stated on the evening of December 16, 2011, he and Christopher were traveling in his truck to his Linden property to go hunting. He stopped at a gas station on Highway 380 to refuel. Turning right to exit the gas station, Schule "eased over" into the right lane of Highway 380 with his blinker activated.

Schule described Cumpian's vehicle as weaving in and out of traffic, and what caught Schule's attention about Cumpian's vehicle was how sporadically it was maneuvering

through traffic and speeding around Schule's truck. Schule went around Cumpian's vehicle to try to get away from Cumpian. Schule was in the right lane, and Cumpian's vehicle passed him at sixty to sixty-five miles per hour in a forty to fifty mile per hour zone. Schule stated he would move out of the way of Cumpian's vehicle, and Cumpian's vehicle would then move in front of him. At one point, Cumpian's vehicle moved in front of Schule's truck and slammed on its brakes, almost coming to a complete stop. Schule passed Cumpian's vehicle at that point, and Schule tried to get away from Cumpian because he was driving recklessly. Schule told Christopher the situation was bad and Cumpian was dangerous, and Schule questioned what could have caused Cumpian to "be like this." Schule saw only Cumpian and did not see a passenger in Cumpian's vehicle. Schule stated he was getting mad, but he was more concerned and scared.

As they were entering Princeton, the confrontation began, with Cumpian screaming and yelling out his window, waving his hand, and telling Schule to pull over. Schule was trying to stay out of Cumpian's way. At a traffic light in Princeton, Cumpian's vehicle pulled beside Schule's pickup truck; Cumpian was yelling. Schule never saw a gun in Cumpian's hand, but Cumpian held his hand out the window with a pointed index finger and a raised thumb resembling a shape of a gun. Schule hoped Cumpian would turn at the traffic light, but he did not. Cumpian's vehicle moved in front of Schule's truck and slammed on his brakes. Schule sped up to get away from Cumpian's vehicle. While Schule's truck was traveling in the left lane, Cumpian passed the truck in the center turn lane. Schule stated that as Cumpian passed Schule's truck, it felt like Cumpian shot or threw something at us, because something loudly impacted the driver's side of Schule's truck. Schule tried to stay behind Cumpian's vehicle, but Cumpian's vehicle again pulled into the center turn lane while Schule was traveling in the left lane. Schule thought Cumpian "was going to do something again, like shoot at us again." Schule stated Christopher was panicking, ranting and raving in disbelief that Cumpian was "acting like this," and saying "I heard something hit the side of the truck" and Cumpian "shot at us."

That is when Schule decided to "pull" his firearm "in case this is going to go worse and worse." Schule reached behind his seat for the case holding his .40 caliber pistol. Schule opened the case, removed the pistol from its holster, and "racked" the slide to load a bullet in the chamber. Schule, who is right-handed, rolled down his window and transferred the pistol from his right hand to his left hand. With his left hand, Schule fired what he recalled were two gunshots over the driver side door mirror of his truck. Cumpian's vehicle was in front of Schule's truck, and Schule was aiming at a tire of Cumpian's vehicle. Schule did not think any shot he fired hit Cumpian's vehicle. Schule believed the pistol he fired holds fifteen rounds of ammunition and there were nine rounds of ammunition in the magazine of the pistol when he left his home that day.

Cumpian did not pursue Schule's truck, and Schule guessed Cumpian stopped in the center turn lane. Schule then put his handgun down and continued to drive east on Highway 380. Christopher said they should pull over, but Schule did not know what to do. Schule did not call 9-1-1 because his cellphone battery had been going dead before he left his house and he planned to recharge it when he reached their destination, and Christopher's cellphone was not working. Schule eventually was stopped by the police.

Schule wrote a statement that was admitted in evidence. Schule's statement contains the following recitation of events following his entry onto Highway 380 after refueling his truck:

> I observed [Cumpian's vehicle] coming fast behind us and proceeded to pass our vehicle. [Cumpian's vehicle] passed us and moved from lane to lane then [Cumpian's vehicle] got in traffic and we passed it and then it came around our vehicle on the left side in the turning lane and pulled in front of us and hit the brakes. We moved over to the next lane and [Cumpian's vehicle] proceeded to pass us again and this time the driver had the window down pointing his hand or finger yelling at us and proceeded to drive recklessly to the driver side from the passenger side of [Cumpian's] vehicle and then it sounded like a gun shot or something hit our vehicle. I then reached for my weapon in the back seat while [Cumpian's] vehicle was in the left lane and fired shots at the rear tire[.] [Cumpian's] vehicle stoped [sic] in the turning lane and we proceeded. My phone battery was dead and Chris's had been turned off just today or we would have called for police assistance. Then a police vehicle stoped [sic] us and held us for questioning.

At the end of the custodial interview, Davidson told Schule that a passenger in Cumpian's vehicle sustained a gunshot wound and was at the hospital in surgery. Schule then inquired, "Where does that put me?"

Abigail Brown testified that about 8:30 p.m. on December 16, 2011, when entering and proceeding eastbound on Highway 380, Cumpian's vehicle and Schule's truck approached her vehicle quickly. Brown was traveling in the right lane, and Cumpian's vehicle passed her in the left lane. Schule's truck then passed her in the left lane. Cumpian's vehicle moved into the right lane ahead of Brown, and Schule's truck then moved into the right lane behind Cumpian's vehicle following very closely. Brown testified Schule was driving very aggressively and "almost cut [her] off to get behind" Cumpian's vehicle. She could not tell if Cumpian's vehicle was trying to lose Schule's truck, which was behind it, or whether Cumpian was hitting his brakes to be aggressive as well. Schule's truck made her more uncomfortable because it positioned itself very close behind Cumpian's vehicle a couple of times, swerving back and forth within a foot of the rear of Cumpian's vehicle. As they traveled eastbound, "they went back and forth, from the white truck being behind the red car, to just back and forth, back and forth."

Brown observed the two vehicles as they traveled through Princeton. She testified Cumpian's vehicle slowed in front of Schule's truck a couple of times and turned the wheels as if it was going to turn right as the vehicles drove through town. Near a gas station, it appeared Cumpian's vehicle was going to pull over or turn right. At that point, Schule's truck was in the left lane. Schule's truck moved in front of Brown's vehicle, and it appeared Schule's truck was going to follow Cumpian's vehicle, but Cumpian's vehicle moved back out onto the roadway.

Brown saw some cans hit the ground, but she did not know from which vehicle the cans were thrown. She did not see any item hitting Cumpian's vehicle or Schule's truck. At one point in the middle of Princeton when Cumpian's and Schule's vehicles were adjacent to one another, she believed the occupants of the vehicles were talking to or yelling at each other. She never saw or heard gunshots. She saw flashes but she did not know what they were.

Brown turned left just past Princeton High School. Cumpian's vehicle and Schule's truck were about seventy-five yards ahead of her. Brown was in the process of calling 9-1-1 because the vehicles were driving so recklessly, when Cumpian's vehicle pulled into the center turn lane of the roadway. Because the incident appeared to be over at that point, she did not call 9-1-1 to report the reckless driving. However, about a week later she saw a news article about a road rage incident, and she realized that the two vehicles described in the news article were the vehicles she had seen. Brown contacted the Princeton Police Department to inform the police that she had seen the vehicles during the incident. After the incident, Brown told an investigator that she had no way of discerning whether Cumpian's vehicle or Schule's truck was the aggressor.

The jury also heard testimony from Joseph Kevin Braswell who witnessed a portion of the road rage incident. On December 16, 2011, Braswell and his wife were traveling on Highway 380 at Airport Road when Braswell saw Cumpian's vehicle and Schule's truck traveling ahead of him at a high rate of speed. The situation reminded Braswell of teenage drivers racing or "playing." As their vehicles approached Princeton, Braswell observed the two vehicles passing each other; Cumpian's vehicle and Schule's truck were "racing back and forth and cutting each other off." Braswell observed Schule's truck move from behind Cumpian's vehicle to beside Cumpian's vehicle, and something that resembled a can was thrown from the passenger side of Schule's truck in the direction of Cumpian's vehicle. The object did not hit Cumpian's vehicle. Schule's truck then moved in front of Cumpian's vehicle.

After Braswell saw the object thrown from Schule's truck, Cumpian's vehicle and Schule's truck continued passing and cutting off one another until they reached the intersection of Fourth Street. In his opinion, Cumpian's vehicle was not trying to get away from Schule's truck. Cumpian's vehicle was behind Schule's truck as they were approaching the Fourth Street intersection. The traffic signal turned yellow, and Schule's truck slowed to stop. Cumpian's vehicle moved in front of Schule's truck and slammed on its brakes. Braswell presumed this was to stop at the traffic light. Because Cumpian's vehicle had proceeded into the intersection before stopping, it had to back up to move out of the middle of the intersection; Cumpian's vehicle backed into the right lane in front of Schule's truck. At that intersection, Braswell turned left onto Fourth Street and did not observe the vehicles further. Sometime later, Braswell contacted the Princeton Police Department and made a statement regarding the incident. He had heard that the incident started as road rage, and that did not surprise him.

Lieutenant Robert Michnick of the Princeton Police Department testified that at about 8:30 p.m. on December 16, 2011, he received a communication from "Collin County dispatch" about a "road rage incident that was coming through" Princeton, that shots had been fired, and an individual had sustained a gunshot wound. The vehicles involved were traveling east on Highway 380 from McKinney and had traveled through Princeton and were on the east side of Princeton near Princeton High School by the time the radio dispatch was received.

East of Princeton High School on Highway 380, Michnick saw Cumpian's vehicle on the side of the road. The rear window and the right rear passenger door window had been "shot out." Cumpian waved Michnick down and told him Brazil had been shot. Brazil appeared to be unconscious with a large wound to the upper portion of his head. Cumpian provided Michnick a description of Schule's truck and the four-wheeler and camping gear in the bed of the truck. Cumpian indicated Schule and Christopher were

wearing camouflage attire. Michnick broadcast that information over the radio, advising that Schule's truck was last seen traveling eastbound on Highway 380.

Cumpian told Michnick that they were traveling eastbound on Highway 380 and "got in a road rage incident with [Schule's truck] where items were kind of thrown back and forth." Cumpian specifically mentioned "Coke cans and a knife and things" being thrown. Michnick found the "locked-blade knife" in the roadway just west of Second Street in Princeton. The knife was "like a pocket knife." Michnick testified that any knife is dangerous, and a knife could be considered a deadly weapon. A photograph admitted in evidence shows a container of canned sodas in the back seat of Cumpian's vehicle. Three bullet shell casings were located in the area of the intersection of Highway 380 and Boorman Lane, which is east of Princeton High School on the outskirts of Princeton. Michnick believed the shell casings were .40 caliber and that a .40 caliber handgun was recovered from Schule's truck. Based on Michnick's observations of Cumpian's vehicle at the scene, including broken windows, apparent projectiles lodged in the dashboard, and the front windshield area, Micknick testified that gunshots would have come from behind Cumpian's vehicle.

Sergeant Thomas L. Anderson of the Texas Highway Patrol testified that on December 16, 2011, he heard a couple of radio broadcasts about a road rage incident involving gunshots. A broadcast indicated one of the vehicles had stopped near Princeton High School, and the other vehicle, a white Ford F-150 with camping gear and a four-wheeler in the bed of the truck, continued traveling eastbound in Anderson's direction. Anderson saw Schule's truck traveling eastbound on Highway 380, followed it for approximately three-quarters of a mile, and then stopped the vehicle. Anderson interpreted Schule's "body language" upon exiting his truck as exhibiting irritation, although Anderson acknowledged Schule was cooperative and that the videotape of the stop made by his patrol vehicle dashboard camera confirmed that cooperation. Anderson remembered hearing that Schule state that "the people in the other vehicle shot at them first." On the videotape of the stop played at trial, Schule stated, "He shot first. I don't know what he shot, but it hit the side of my truck."

Princeton Police Department Sergeant Phillip Pannell testified that he participated in the investigation of the December 16, 2011 incident. He was called to the location of Schule's truck and searched the vehicle, collected evidence, and took photographs. There was a .40 caliber pistol in the truck, and the magazine in the pistol was empty. Pannell believed the magazine could hold sixteen bullets, although he was not able to testify as to how many shots Schule fired. Pannell was aware that three bullet shell casings were recovered.

In his report, Pannell stated Schule was fully cooperative and gave consent for police officers to search his truck for evidence. An uncharged cellphone was located in the bottom of the truck's console. Parnell testified that a photograph of Schule's truck, which was admitted in evidence, appears to show fluid may have run down the exterior of the truck. Pannell's report stated there was a defect in the windshield of Schule's truck, and Pannell testified the defect may have resulted from the impact of a pocket knife striking the windshield. Other than the defect in the truck's windshield, Pannell did not recall any major damage to Schule's truck.

Pannell briefly went to the location of Cumpian's vehicle at the intersection of Highway 380 and Boorman Lane. According to Pannell, the distance between the traffic light at Second Street and Boorman Lane is approximately seven tenths of a mile. Photographs of Cumpian's vehicle admitted in evidence showed the rear window

and right rear passenger window broken out, as well as what appeared to Pannell to be a bullet hole in the shattered windshield. To Pannell, it appeared that the shots were fired from a gun located behind Cumpian's vehicle, such that a bullet went through the rear window and a bullet went through the rear passenger window, resulting in both of those windows being broken out.

In his report, Pannell stated that both drivers could have prevented this incident. Pannell testified he understood that a person acting based on an apprehension and fear of danger has a right to self-defense under the law. In his report, Pannell stated it could not be proven Schule did not intentionally and knowingly shoot at Cumpian and Brazil. At trial, Pannell testified that from the facts, it could not be proven Schule was "actually shooting at somebody, just a vehicle." In Pannell's opinion, firing a gun from a moving vehicle on a road occupied by other vehicles was reckless. Pannell was aware Cumpian admitted "we threw a knife" and "we were throwing full, unopened Coke cans" at Schule's truck. In Pannell's opinion, a knife thrown at a vehicle with a partially opened window possibly could be considered a deadly weapon.

The jury heard the testimony of Schule's work supervisor, Todd Childress, and neighbor, Ronnie Cox. Childress testified Schule has a reputation in the community, and Cox testified Schule has a reputation in the neighborhood, as a peaceful individual.

A jury found Schule guilty of second-degree felony aggravated assault, *see* Tex. Penal Code Ann. § 22.02(a)(2) & (b), and assessed punishment of twelve years' confinement.

*Schule v. State*, 2015 WL 1859040 at *1-7. The Fifth Court of Appeals found that the evidence was sufficient to sustain the conviction. *Id.* at 9. The Court further found that the jury could have found against Schule on his claim of self-defense beyond a reasonable doubt. *Id.*

## Standard of Review

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). In the course of reviewing state proceedings, a federal court does "not sit as a super state supreme court to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

The petition was filed in 2016, thus review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas

corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).  With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).  As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184.  "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011).  With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing § 2254(e)(1)).  The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted).  More recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted).

Discussion and Analysis

A.    <u>Actual Innocence Due To Ineffective Assistance of Counsel</u>

Schule's first ground for relief is that he is actually innocent due to ineffective assistance of counsel. A claim of actual innocence is totally distinct from a claim of ineffective assistance of counsel. With respect to actual innocence, the Supreme Court has clearly held that a claim of actual innocence does not state an independent, substantive constitutional claim and is not a basis for federal habeas corpus relief. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Supreme Court left open whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief. *Id.* at 417. The Fifth Circuit, however, rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998). Schule's various claims arguing actual innocence fail to state a claim upon which relief may be granted in a federal habeas corpus proceeding.

B.    <u>Ineffective Assistance of Trial Counsel</u>

Schule also claims that he is entitled to relief based on ineffective assistance of trial counsel. Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690. Under the second prong, the petitioner must show that his attorney's deficient performance resulted in actual prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

11

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102. *Also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir. 2013).

### 1. Failure to Call Witnesses

Schule initially claims that his attorney was ineffective for failing to call witnesses who could have proven that he was actually innocent, particularly his son, Christopher Schule, who was in the car with him. He adds that his witnesses would have shown that Cumpian was the aggressor and that he acted in self-defense.

The Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). To succeed on the claim, a petitioner must show that had counsel investigated the claim he would have found witnesses to support the defense, that such witnesses were available, and had counsel located and called these witnesses, their testimony would have been favorable and they would have been willing to testify on his behalf. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir.), *cert. den.,* 469 U.S. 1041 (1984). Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness severely undermines a claim of ineffective assistance. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Conclusory claims are insufficient to entitle a habeas corpus petitioner to

relief. *United States v. Woods*, 870 F.2d 285, 288 (5th Cir. 1989); *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982). *See also King v. Cockrell*, 33 F. App'x 703 (5th Cir. 2002).

Schule's claim that his attorney was ineffective for failing to call witnesses was fully developed during the state habeas corpus proceedings. His trial attorney, Chris Knox, provided the following response concerning his failure to call Christopher Schule as a witness:

> 11.    Counsel absolutely had a defensive strategy for trial. The trial strategy was that Mr. Schule acted in self-defense and that strategy is clearly, consistently, and unequivocally articulated in the record. Counsel repeatedly detailed the law and facts supporting the defensive strategy throughout the duration of the trial. Counsel elicited testimony establishing the defensive strategy from multiple witnesses and, ultimately, focused the majority of closing argument on the issue of self-defense, presumption-of-reasonableness, and justification.

> 15.    Mr. Schule did **not** ask counsel to call Christopher Schule as a witness at trial. In fact, on many occasions, both prior to and during trial, counsel articulated to Mr. Schule why Christopher Schule probably would not be a helpful witness for the defensive strategy. Mr. Schule was keenly aware of the reasons counsel was hesitant to call Christopher Schule as a witness. Further, during every discussion pertaining to Christopher Schute's potential testimony, Mr. Schute readily agreed with Counsel's decision not to call Christopher Schule as a witness.

> 16.    To the best of Counsel's knowledge, Christopher Schule was available to testify.

> 17.    Counsel did not call Christopher Schute as a witness because counsel did not believe that Christopher Schule would have advanced the defense's trial strategy. Counsel believed at the time of trial, and does currently believe, that any relevant and material facts that Christopher Schule could have testified to were introduced into the record by the testimony of other witnesses. Specifically, Christopher Schule could have testified that (1) Justin Brazil and Joe Cumpian started the altercation - a fact Justin Brazil blatantly and arrogantly admitted while testifying at trial and (2) Mr. Schule acted in self-defense - a fact already introduced into the record as the result of the State publishing Mr. Schule's interview and the testimony of the investigating officers.
>
> Moreover, counsel was extremely leery of some of the facts that may have been elicited, for the first time, by Christopher Schule's testimony. If elicited at trial, those facts were potentially devastating to the defense's strategy.
>
> Counsel extensively interviewed Christopher Schule prior to trial. During the interview, and based on his own personal recollections, Christopher Schule recited facts that were either inconsistent with Mr. Schule's version of the incident or, alternatively, omitted from Mr. Schule's and Christopher Schule's previous statements to Counsel and law-enforcement. Specifically, counsel asked Christopher Schule for his explanation pertaining to why "six characteristic gunshot primer residue particles were confirmed on the GSR kit

collected from Christopher Anthony Schule." Christopher Schule stated that the GSR test performed on him was, in his opinion, presumptively positive because he also fired the handgun out the window. This fact was wholly inconsistent with the information that Applicant, Mr. Schule, had previously communicated to Counsel. Additionally, neither Christopher Schule nor Mr. Schule told the investigating officers that Christopher Schule may also have fired the handgun contemporaneously to the events in question.

Counsels' strategy at trial hinged on the credibility and believability of Mr. Schule. It was absolutely imperative that the jury believe that Mr. Schule reasonably believed his actions were justified. To achieve that objective, Counsel wished to highlight the fact that Mr. Schule was completely and *fully* truthful with the arresting and investigating officers. Meaning, Mr. Schule told the truth - the *entire* truth - because he truly and reasonably believed his actions were justified in defense of himself and his son. Christopher Schule's recollection, however, that he too fired the handgun out the window, in conjunction with the fact neither he nor Mr. Schule ever mentioned that to the police, would have, for all intents and purposes, destroyed Mr. Schule's credibility and crippled the defense's strategy.

Further, Christopher Schule's recollection was that the victim's car was "bumper to bumper" with defendant's car at the time the shots were fired. This fact is, again, wholly inconsistent with the testimony of all other witnesses and, additionally, inconsistent with Mr. Schule's statement to law-enforcement. Further yet, during his interview with the investigating officers, Christopher Schule said [he believed] Mr. Schule's phone was working at the time of the incident. This is inconsistent with, and would have directly contradicted, Mr. Schule's statement. As such, Christopher Schule's testimony would have impeached Mr. Schule's statement and interview and, in doing so, would have called into question the veracity and believability of Mr. Schule. As a result, Counsel's trial strategy of highlighting that Mr. Schule was wholly truthful with law-enforcement would have been significantly compromised - if not completely negated.

Additionally, Christopher Schule became visibly nervous and shaken while answering questions in the relatively relaxing confines of Counsel's office. As such, Counsel had serious concerns about Christopher Schule's ability to clearly and calmly testify in the sterile environment of a courtroom and during an emotionally charged trial. Thus, Counsel wholeheartedly believed, and still believes, that Christopher Schule's testimony was not necessary to advance the defense's strategy. But, to the contrary, had Christopher Schule testified, his testimony had potential to be incredibly harmful to the defense. Therefore, after a thorough risk-reward analysis, Counsel decided that Christopher Schule should not be called as a witness. And, at the time that decision was made, Counsel fully discussed the issues with Mr. Schule and Mr. Schule readily agreed with Counsel's analysis.

18.     As stated above, Counsel believes that all evidence contained in Christopher Schute's statement ("affidavit") that could have potentially been helpful to the defense was, otherwise, before the jury.

SHCR at 66-69.

After considering the evidence, the trial court issued the following findings:

6. Counsel Chris Knox is an officer of the Court, well known to the court, and credible;

7. Counsel Knox's affidavit is credible;

10. [Schule] never asked that Christopher be called as a witness at trial;

11. The basic trial strategy in this case hinged on [Schule's] credibility;

12. It was absolutely imperative that the jury believe that [Schule] reasonably believed that his actions were justified;

13. During interviews with [Schule's] son, Christopher Schule, Christopher claimed that he had also fired the handgun out of the car window, a fact that neither [Schule] nor Christopher had disclosed to police;

14. Christopher also told counsel that Cumpian's car was bumper-to-bumper with his father's car at the time of the shooting;

15. This fact was also wholly inconsistent with [Schule's] statement to police and the testimony of all of the other witnesses;

16. In addition, Christopher told counsel that [Schule's] phone was working at the time of the shooting;

17. This was in direct conflict with [Schule's] statement;

18. Christopher's testimony would have impeached [Schule's] statement and interview, and in doing so, would have called into question [Schule's] credibility, and trial counsel's strategy would have been significantly compromised;

19. Given counsel's interview with Christopher and knowledge of what Christopher was actually willing to testify to, Christopher Schute's affidavit is not credible;

20. Christopher "became visibly nervous and shaken while answering questions in the relatively relaxing confines of Counsel's office";

21. Counsel discussed his concerns about Christopher's potential testimony with [Schule], and at no point in time did [Schule] request or urge that Christopher testify at trial;

22. Counsel had valid reasons for not calling Christopher Schule to testify at trial;

23. [Schule] has not met his burden of proof by a preponderance of the evidence that trial counsel was deficient for failing to call Christopher to testify;

24. Christopher's testimony would have been in direct conflict with [Schule's] own statements to police;

25.    [Schule] has failed to meet his burden of proof by a preponderance of the evidence that the outcome of the trial would have been different had counsel called Christopher to testify;

SHCR at 128-130.  The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing.

Schule has not shown that his attorney's representation was deficient or that he was prejudiced by deficient representation with respect to his claim that trial counsel was ineffective for failing to call witnesses, particularly Christopher Schule.  He has not satisfied his burden for obtaining relief under *Strickland*.  Relief should also be denied because he failed to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Moreover, he failed to overcome the "doubly" deferential standard that must be accorded to his trial attorney in light of both *Strickland* and § 2254(d).  *See Richter*, 562 U.S. at 105.  The ineffective assistance of counsel claim lacks merit.

2.    Failure To Request a Proper Jury Instruction

Schule also alleges that trial counsel was ineffective for failing to request a proper jury instruction.  He adds that the oral arguments on the matter were not substitutes for a proper jury instruction.

This claim was likewise fully developed during the state habeas corpus proceedings.  Counsel provided the following response:

12.    Counsel did request a presumption-of-reasonableness instruction under § 9.32(b) of the Penal Code.  Counsel, on behalf of Mr. Schule, requested the following instruction be included in the charge on the presumption-of-reasonableness:

The defendant is not required to prove self-defense.  Rather, the state must prove, beyond a reasonable doubt, that self-defense does not apply to this defendant.

Under certain circumstances, our law creates a presumption that a person's belief - that the deadly force he used was immediately necessary - was reasonable.  A presumption is a

16

conclusion the law requires you to reach if certain other facts exist.

Therefore, you must find the defendant's belief - that the deadly force he used was immediately necessary - was reasonable unless you find the state has proved, beyond a reasonable doubt, that the defendant neither knew nor had reason to believe that the person or persons against whom the deadly force was used was committing or attempting to commit the offense of murder or that the defendant provoked the person against whom the deadly force was used or that the defendant, at the time the deadly force was used, was engaged in criminal activity other than a class C misdemeanor that is a violation of a law or ordinance regulating traffic.

13. The trial Court overruled Counsel's request for the proposed charge.

14. The trial Court's ruling was discussed in the Court of Appeals' opinion. The Court of Appeals stated:

Because there was some evidence to support Schule's requested presumption-of-reasonableness instruction pursuant to section 9.32(b), we conclude the trial court erred by failing to instruct the jury with regard to the presumption·of reasonableness instruction. *See Almanza,* 686 S.W.2d at 171

The Court of Appeals held that the Defendant did not suffer actual harm by the trial court's refusal to include in the charge Counsel's requested language. The Court of Appeals explained its holding accordingly:

With respect to the entirety of the charge, this factor does not weigh in favor of a conclusion Schule suffered some actual, rather than theoretical, harm from the trial court's failure to include a complete presumption-of-reasonableness instruction in the jury charge. Here, the instructions alerted the jury that Schule's belief that deadly force was immediately necessary was presumed to be reasonable if he knew or had reason to believe Cumpian or Brazil, as the persons against whom deadly force was used, were committing or attempting to commit murder. *See Villarreal,* 453 S.W.3d at 434. Further, a complete presumption-of-reasonableness instruction would have permitted the jury to decide the presumption did not apply to the facts of this case.

SHCR at 66-67 (footnotes omitted)

After considering the evidence, the trial court issued the following findings:

26. The court of appeal agreed that counsel's requested presumption-of-reasonableness instruction on self-defense should have been allowed in the jury charge because there was some evidence at trial suggesting that Cumpian provoked [Schule];

27. Counsel did request the jury instruction discussed in the court of appeals's opinion;

28. [Schule] has not met his burden of proof that counsel was deficient for failing to request that instruction;

29. [Schule] has failed to show by a preponderance of the evidence that the outcome of the trial would have been different had counsel requested the instruction that he did, in fact, request;

SHCR at 130-31. The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing.

The record shows that counsel asked for a self-defense instruction, which was rejected. The Fifth Court of Appeals found that the trial court erred in denying the request. *Schule*, 2015 WL 1859040 at *14. The Court further found that Schule was not harmed by the omission. *Id.* at *17. Nonetheless, the dispositive factor is that counsel's representation was not deficient because he, in fact, requested a proper self-defense instruction. Schule has not shown that his attorney's representation was deficient or that he was prejudiced by deficient representation. He has not satisfied his burden for obtaining relief under *Strickland*. Relief should also be denied because he failed to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded to his trial attorney in light of both *Strickland* and § 2254(d). *See Richter*, 562 U.S. at 105. The ineffective assistance of counsel claim lacks merit.

C.    Failure to Have Justin Brazil's Testimony Read Back to the Jury

In his third ground for relief, Schule claims that the trial court erred by denying the jury's request to have Justin Brazil's testimony read back to the jury. He argues that the trial court's decision violates Article 36.25 of the Texas Code of Criminal Procedure.

After considering the claim, the trial court issued the following findings:

30.     [Schule] alleges that the trial court violated article 36.25 of the Texas Code of Criminal Procedure when it failed to have testimony read back to the jury;

31.     Violations of statutes, rules, and other non-constitutional doctrines are not cognizable on writ of habeas corpus;

SHCR at 130-31.  The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing.

In the present petition, Schule repeats his claim as presented to the state courts.  In response, the Director observes that the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).  Thus, allegations that state law was violated do not constitute an independent basis for federal habeas relief. *Mayabb v. Johnson,* 168 F.3d 863, 869 (5th Cir. 1999); *Narvaiz v. Johnson,* 134 F.3d 688, 695 (5th Cir. 1998).  Indeed, as was previously explained on page nine of this opinion, a federal court does "not sit as a super state supreme court to review error under state law." *Wood*, 503 F.3d at 414; *Porter*, 709 F.2d at 957.  Schule's claim is not cognizable on federal habeas review.

The ground for relief should be denied for the additional reason that Schule has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Schule's third ground for relief lacks merit.

D.     Failure to Allow a Witness to Testify

Schule next alleges that the trial court abused its discretion by not allowing his witnesses to testify.  This issue was raised on direct appeal.  Schule wanted to introduce evidence of prior bad acts of violence and aggression on the part of Cumpian.  The trial court excluded the evidence.  On appeal, the Fifth Court of Appeals concluded that the "trial court's exclusion of evidence regarding various

alleged bad acts and prior misconduct by Cumpian was not 'outside the zone of reasonable disagreement.' . . . We cannot conclude the trial court abused its discretion in exclusion of the proferred evidence of alleged prior acts of violence or aggression on the part of Cumpian." *Schule*, 2015 WL 1859040 at *10. Schule did not appeal the decision further by filing a petition for discretionary review.

Schule raised the issue anew in the state habeas proceedings. The trial court rejected the claim for procedural reasons as follows:

> 32.   [Schule] alleges that the trial court erred in not allowing witnesses to testify regarding evidence of Cumpian's aggravated assault of a friend for which Cumpian received probation, an assault of an ex-girlfriend's father with a brick, an indictment which was dismissed for choking his wife or girlfriend, and Cumpian's Facebook posts after the shooting in this case, including a post about a fight in which Cumpian was purportedly involved before [Schule's] trial;

> 33.   This issue was raised on direct appeal, and the court of appeals held that the trial court did not abuse its discretion in excluding this evidence.

> 34.   Claims that are raised and addressed on direct appeal cannot be re-litigated in habeas corpus.

SHCR at 131-32. The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing.

The Director argues that the claim is unexhausted because it was not presented to the Texas Court of Criminal Appeals in a manner that allowed the court to review the merits of his trial error claims. *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982). She further argues that the claim is now procedurally barred because Schule failed to present his claims in a procedurally proper manner. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

State prisoners bringing petitions for a writ of habeas corpus are required to exhaust state remedies before proceeding in federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective. 28 U.S.C. § 2254(b)(1). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (internal quotation marks and citations omitted). In Texas, all claims must be presented to and ruled on by the

Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429 (5th Cir. 1985); *Deters v. Collins*, 985 F.2d 789 (5th Cir. 1993). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc). In recent years, however, unexhausted claims in a mixed petition have been dismissed as procedurally defaulted. *Fearance*, 56 F.3d at 642.

The Supreme Court announced the procedural default doctrine in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. For example, the Fifth Circuit has applied the procedural default doctrine in cases where Texas habeas courts expressly held that a claim was procedurally defaulted because the petitioner could have but did not raise it on direct appeal. *Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir. 2006), *cert. denied*, 552 U.S. 834 (2007); *Coleman v. Quarterman*, 456 F.3d 537, 546 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004); *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994).

In the present case, Schule raised the present claim on direct appeal to the Fifth Court of Appeals. He did not, however, continue with his claim to the Texas Court of Criminal Appeals on discretionary review; thus, he did not exhaust the claim on direct appeal. When he proceeded to raise the claim anew in the state habeas proceeding, the state habeas court found that "[c]laims that are raised and addressed on direct appeal cannot be re-litigated in habeas corpus." SHCR at 132. As such, Schule procedurally defaulted his chance to raise this claim in federal court because he failed to exhaust the claim in a proper manner on discretionary review. The Director persuasively argues that the claim is unexhausted and procedurally defaulted.

Finally, the Court observes that even if the claim was not procedurally defaulted, it would be denied because grounds for relief based on state evidentiary rulings ordinarily are not cognizable on federal habeas review. *Wood*, 503 F.3d at 414 (federal courts "do not sit as a super state supreme court on a habeas proceeding to review error under state law"); *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus."). Schule has not shown that he is entitled to federal habeas relief on this claim.

E.      Ineffective Assistance of Appellate Counsel

Schule next claims that he is entitled to relief because his appellate counsel did not raise valid claims on direct appeal, including his claims of ineffective assistance of trial counsel.

The two-prong *Strickland* test applies to claims of ineffective assistance of counsel by both trial and appellate counsel. *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). An indigent defendant does not have a constitutional right to compel appointed counsel to include every nonfrivolous point requested by him; instead, an appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." *Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008) (citation and internal quotation marks omitted); *Adams v. Thaler*, 421 F. App'x 322 (5th Cir. 2011). To demonstrate prejudice, a petitioner must "show a reasonable probability that, but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001) (citations omitted).

In the present case, Schule has not shown that he would have prevailed on claims that were not raised on direct appeal. In particular, his ineffective assistance of trial counsel claims lack merit. Schule has not shown that appellate counsel's representation was deficient or that he was prejudiced by such deficient representation. His ineffective assistance of appellate counsel claim lacks merit.

The Court further observes that this claim was fully developed during the state habeas corpus proceedings. Schule's appellate counsel, Lori L. Ordiway, responded to Schule's allegations of ineffective assistance of appellate counsel by saying that she "did not allege ineffective assistance of

counsel on direct appeal" because "there were no grounds for alleging such a claim," and "in [her] experience, claims of ineffective assistance of counsel are not successful on direct appeal." SHCR at 92 (nos. 19–21). She further attested:

> My duty was to investigate all potential grounds for reversal of [Schule's] conviction, which duty I fully met. I exhaustively read the entirety of the appellate record, researched any possible issues for review, and then prepared and filed the appellate brief on [Schule's] behalf that I believed was supported by the facts and applicable law in this case.
>
> Accordingly the issues that I presented in [Schule's] appellate brief were those that, in my opinion, were the most promising and meritorious issues for review. These were the issues that I concluded might persuade the court of appeals to reverse [Schule's] conviction.

SHCR at 97–98 (no. 22).

After considering the claim, the trial court issued the following findings:

35.  Counsel Lori Ordiway is an officer of the Court, well known to the court, and credible;

36.  Counsel Ordiway's affidavit is credible;

37.  Counsel did not raise ineffective assistance of counsel on direct appeal because there were no grounds for alleging such claims and, in her experience, claims of ineffective assistance of counsel are not successful on direct appeal in cases like this, where the record is undeveloped;

38.  Counsel thoroughly read and examined the appellate record, researched and considered several different arguments to present on [Schule's] behalf, and winnowed out weaker arguments to focus on the key issues that she believed were meritorious;

40.  Appellate counsel chose to raise only issues that were supported by the appellate record;

41.  [Schule] has not met his burden of proof by a preponderance of the evidence that counsel was deficient for failing to raise an ineffective assistance of counsel claim on direct appeal;

44.  [Schule] has not met his burden of proof by a preponderance of the evidence that the outcome of the appeal would have been different had appellate counsel raised issues of ineffective assistance of counsel on direct appeal.

SHCR at 132-34. The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing.

Schule has not shown that his appellate attorney's representation was deficient or that he was prejudiced by deficient representation. He has not satisfied his burden for obtaining relief under *Strickland*. Relief should also be denied because he failed to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded to his appellate attorney in light of both *Strickland* and § 2254(d). *See Richter*, 562 U.S. at 105. The ineffective assistance of appellate counsel claim lacks merit.

F.    State Witness Joe Cumpian Committed Perjury

Schule finally alleges that the State presented testimony by Joe Cumpian that was tainted by rank perjury. He focuses on contradictions in his testimony.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted). Moreover, the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (citations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (citations omitted). The Fifth Circuit applied the standards set forth in *Napue* and *Giglio* in *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.), *cert. denied*, 536 U.S. 978 (2002). A petitioner must prove that the prosecution knowingly presented or failed to correct materially false testimony during trial. *Id.* at 337. Due process is not implicated by the prosecutions's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements. *Id.* Perjury is not established by mere contradictory testimony from witnesses, inconsistencies within a witness' testimony and conflicts between reports, written statements and the

24

trial testimony of prosecution witnesses. *Koch*, 907 F.2d at 531. To prove a due process violation, a petitioner must demonstrate: (1) that the testimony in question was actually false, (2) that the prosecutor was aware of the perjury, and (3) that the testimony was material. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). Perjured testimony is material only when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000), *cert. denied*, 531 U.S. 1134 (2001).

In the present case, Schule has not shown that Cumpian committed perjury. He has offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).

In addition to the foregoing, the state trial court considered and rejected Schule's claim that the State presented perjured testimony. SHCR at 134. The Texas Court of Criminal Appeals subsequently denied relief based on the findings of the trial court without a hearing. The ground for relief should be denied for the additional reason that Schule has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Schule has not shown that he is entitled to relief on his perjury claim.

In conclusion, Schule's petition for a writ of habeas corpus lacks merit and should be denied.

### Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 480 U.S. ___, 137 S. Ct. 759, 773 (2017). Instead, under 28 U.S.C. § 2253(c)(1), he must first obtain a certificate of appealability ("COA") from a circuit justice or judge. *Id.* Although Schule has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability

because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner need only show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Supreme Court recently emphasized that the COA inquiry "is not coextensive with merits analysis" and "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 336). Moreover, "[w]hen the district court denied relief on procedural grounds, the petitioner seeking a COA must further show that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017) (citation omitted)).

In this case, reasonable jurists could not debate the denial of Schule's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. Accordingly, Schule is not entitled to a certificate of appealability as to his claims. It is therefore

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. A certificate of appealability is **DENIED**. All motions not previously ruled on are **DENIED**.

**SIGNED this 21st day of August, 2019.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE